IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

MITZY DAWN FLEMING            )
                              )
v.                            )        No. 3:10-1166
                              )        Judge Nixon/Bryant
SOCIAL SECURITY ADMINISTRATION )


To:     The Honorable John T. Nixon, Senior Judge


## REPORT AND RECOMMENDATION

        This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c), to

obtain judicial review of the final decision of the Social Security Administration ("SSA" or

"the Administration"), through its Commissioner, denying plaintiff's application for

disability insurance benefits ("DIB") and supplemental security income ("SSI"), as provided

under the Social Security Act.  The case is currently pending on plaintiff's motion for

judgment on the administrative record (Docket Entry No. 14), to which defendant has

responded (Docket Entry No. 15).  Plaintiff has further filed a reply brief in support of her

motion.  (Docket Entry No. 16)  Upon consideration of these papers and the transcript of the

administrative record (Docket Entry No. 10),[1] and for the reasons given below, the

undersigned recommends that plaintiff's motion for judgment be DENIED and that the

decision of the SSA be AFFIRMED.

---

[1]Referenced hereinafter by page number(s) following the abbreviation "Tr."

# I. Introduction

Plaintiff filed her applications for DIB and SSI on September 12, 2006, alleged disability onset as of May 2, 2003, due to high blood pressure, migraines, depression, anxiety and panic attacks, irritable bowel syndrome, arthritis, asthma, diabetes, and liver problems. (Tr. 137-50)  Plaintiff subsequently amended her alleged onset date to August 1, 2006.  (Tr. 25-26)  Plaintiff's applications were denied upon initial review, and then again upon reconsideration.  Thereafter, plaintiff requested and received a de novo hearing before an Administrative Law Judge (ALJ).  The ALJ heard the case on September 3, 2009.  (Tr. 23-46)  Plaintiff was represented by counsel at the hearing, and testimony was received from plaintiff and from an impartial vocational expert.  At the conclusion of the hearing, the ALJ took the matter under advisement.  On September 29, 2009, the ALJ issued a written decision finding plaintiff not disabled.  (Tr. 11-22)  That decision contains the following enumerated findings:

1.     The claimant meets the insured status requirements of the Social Security Act through March 30, 2009.

2.     The claimant has not engaged in substantial gainful activity since August 1, 2006, the amended alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.     The claimant has the following severe impairments:  lumbar degenerative disc disease, obesity, diabetes mellitus, anemia, non-alcoholic steatohepatitis (NASH), asthma, headaches, depressive disorder and panic disorder (20 CFR 404.1520(c) and 416.920(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

2

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk 6 hours during an 8-hour workday; sit for about 6 hours during and 8-hour workday; and occasionally climb, balance, stoop, crouch, kneel and crawl. She should avoid irritating inhalants and temperature extremes. She can understand, remember, and carry out short and simple instructions and make judgments on simple work-related decisions. She should not perform jobs which require contact with the public.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on May 5, 1977 and was 29 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from August 1, 2006 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 13-15, 20-21)

On October 13, 2010, the Appeals Council denied plaintiff's request for review of the ALJ's decision (Tr. 1-3), thereby rendering that decision the final decision of the

3

Administration.  This civil action was thereafter timely filed, and the court has jurisdiction.

42 U.S.C. §§ 405(g), 1383(c)(3).  If the ALJ's findings are supported by substantial evidence,

based on the record as a whole, then those findings are conclusive.  Id.


## II.  Review of the Record

### A.  Medical Evidence

Plaintiff was diagnosed with severe iron deficiency anemia in July 2004.  She

had failed oral iron supplements, and was treated with intravenous iron replacement

therapy, which succeeded in resolving her complaints of weakness and fatigue by October

2005.  (Tr. 539)  She was followed by oncologist Dr. Dianna L. Shipley, who last saw plaintiff

in March 2009, when she had no complaints other than some aching and was worked up for

hemochromatosis (excess iron as a result of the infusion therapy), which appears to have

been ruled out.  (Tr. 16, 537-38, 550)

On November 4, 2004, plaintiff saw Dr. Jawaid Ahsan with complaints of

intermittent right-sided numbness and migraine headaches (Tr. 336).  Plaintiff underwent

nerve conduction studies on all four extremities on November 11, 2004, the results of which

were essentially normal (Tr. 338-41).

On March 9, 2006, plaintiff saw Dr. John Bacon, an orthopaedic surgeon,

complaining of a long history of low back pain which radiated down her right hip and leg

(Tr. 577).  Although an examination showed lumbar tenderness, muscle spasm, and limited

range of motion, she had full range of motion of her hips and her straight leg raising was

4

negative bilaterally.[2]  Dr. Bacon stated that he had explained to plaintiff that her lower extremity pain was not related to her lower back symptoms, and opined that her pain was "more muscular in nature" (Id.).

On May 30, 2006, plaintiff indicated to Dr. Shipley's nurse that she had been recently diagnosed with rheumatoid arthritis and a urinary tract infection (Tr. 362).

Plaintiff saw Dr. Linda Blazina, Ph.D., on March 14, 2007, for a consultative psychological evaluation due to plaintiff's allegation of panic attacks (Tr. 388-92).  On examination, plaintiff's attention and concentration were within normal limits and she demonstrated average intellectual functioning (Tr. 389).  Dr. Blazina diagnosed plaintiff with depressive disorder, not otherwise specified, and panic disorder without agoraphobia[3] (Tr. 392).  She further assessed plaintiff with a Global Assessment of Functioning (GAF) score of 70.[4]  Dr. Blazina opined that, although plaintiff's social interaction abilities were mildly to moderately impaired due to her anxiety and depression, her ability to understand and

---

[2]Straight leg-raising (SLR) tests are designed to detect nerve root pressure, tension, or irritation of the sciatic nerve.  With the knee fully extended, the physician raises the involved leg from the examination table.  A positive SLR test requires reproduction of pain at an elevation of less than 60 degrees, and is the single most important sign of nerve root pressure produced by a herniated disc.  Gunnar Andersson and Thomas McNeill, Lumbar Spine Syndromes: Evaluation and Treatment 35, 78-79 (1989).

[3]Intense, irrational fear of open spaces, characterized by marked fear of being alone or of being in public places where escape would be difficult or help might be unavailable.  It may be associated with panic attacks or may occur independently.  Dorland's Illustrated Medical Dictionary (Dorland's), 30th Edition, p. 40 (2003).

[4]The Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV), indicates that GAF scores ranging from 61 to 70 reflect only mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.  DSM-IV, p. 32.

5

remember or to sustain concentration and persistence did not appear impaired (Id.).

On August 15, 2007, plaintiff saw Dr. Albert Gomez for a consultative physical examination due to complaints of history of asthma, chronic shortness of breath, wheezing, and dry cough (Tr. 460-63). On examination, Dr. Gomez noted that plaintiff walked with a mild limp without assistive devices (Tr. 461). She was, however, able to get on and off the examination table without difficulty (Id.). Plaintiff's motor strength was 5/5 in the upper and lower extremities and her deep tendon reflexes were 2+ bilaterally (Tr. 462). Dr. Gomez observed only moderate tenderness to palpation in plaintiff's lumbar spine and full range of motion except for flexion, which showed 80 degrees (Id.). Based on his examination of plaintiff, Dr. Gomez opined that plaintiff could occasionally lift 20 pounds in an 8-hour workday and stand or sit at least 6 hours in an 8-hour workday with normal breaks (Tr. 463).

On August 30, 2007, Dr. Nathaniel Robinson, a nonexamining Disability Determination Services (DDS) physician, completed a Physical Residual Functional Capacity Assessment (Tr. 468-75) in which plaintiff was found capable of lifting 20 pounds occasionally and 10 pounds frequently; standing and/or walking about 6 hours in an 8-hour workday; sitting about 6 hours in an 8-hour workday; and pushing and/or pulling to an unlimited degree (Tr. 469). Dr. Robinson further opined that, due to her combination of conditions, plaintiff could only occasionally climb, balance, stoop, kneel, crouch, and crawl (Tr. 470).

Plaintiff sought treatment on January 17, 2008, due to complaints of depression and anxiety (Tr. 810). She reported having a panic attack at work, leading her to quit her job (Id.). Plaintiff was diagnosed with bipolar disorder and anxiety disorder not otherwise specified (Tr. 808).

6

On June 23, 2008, plaintiff overdosed on her prescribed medications after arguing on the phone with her husband (Tr. 586). She initially denied that it was a suicide attempt (id.), but later admitted that it actually was (Tr. 587-88). On July 10, 2008, plaintiff's psychiatrist sent her to the Family & Children's Clinic due to her apparent suicide attempt two weeks previously (Tr. 518). Plaintiff was diagnosed with depression and was advised to continue seeing her psychiatrist (Tr. 519). On October 14, 2008, plaintiff indicated that she planned to begin school for Medical Assistant training in January (Tr. 595).

On December 8, 2008, plaintiff reported that she "had been doing well" and had started school the previous week (Tr. 601). On June 5, 2009, it was reported that plaintiff had a 4.0 grade point average and had made the Dean's List (Tr. 626).

Plaintiff was involved in a motor vehicle accident in March 2009, during which she sustained a blow to the head and, subsequently, complained of mild neck pain (Tr. 561). With the exception of some mild narrowing of the C5-6 disc space (Tr. 567), plaintiff's x-rays and other diagnostic tests were normal (Tr. 562). Plaintiff was diagnosed with a neck strain and an upper back strain (Id.). Further, on examination, her neck and back range of motion was within normal limits and her sensation was intact (Tr. 564). By May 14, 2009, plaintiff reported that her neck was feeling better since the accident (Tr. 623).

B. Hearing Testimony and Other Evidence

At the time of her administrative hearing, plaintiff was 32 years of age (Tr. 28), had obtained a GED (Tr. 28, 149, 390), and had past relevant work experience as an assembler, corrections officer, van driver, and lead worker for portraits (Tr. 27, 142). When asked how much weight she was able to lift and carry, plaintiff testified that she could lift and carry about 20 pounds (Tr. 36). Regarding her activities of daily living, plaintiff

7

indicated that she cared for her three children (fed them, bathed them, and helped them with homework) (Tr. 157, 182, 183, 391), cooked (Tr. 158, 184, 391), dusted (Tr. 158), did laundry (Tr. 184), vacuumed (Tr. 184, 391), mopped and swept the house (Tr. 391), drove a car (Tr. 185, 390-391), shopped for groceries (Tr. 159, 160, 185, 186), watched television (Tr. 160, 182, 186), and did puzzles (Tr. 160).

Testifying as an impartial vocational expert (VE), Ms. Michele McBroom Weiss[5] was asked to consider the availability of light work[6] for an individual with plaintiff's age, education, and past work experience who would be limited to occasional postural activities; would require no exposure to irritating inhalants or temperature extremes; would be able to understand, remember, and carry out only short and simple instructions and make judgments only on simple work-related decisions; and would require work that does not involve public interaction (Tr. 43).

In response, the VE stated that such an individual would be capable of performing the following light jobs: housekeeper, which offered approximately 7,300 jobs in Tennessee and 375,000 nationally; packer, 7,100 jobs in Tennessee and 318,000 nationally; and folding machine operator, 1,000 in Tennessee and 70,000 nationally (Tr. 43-44). The VE also identified three sedentary[7] jobs which the individual could perform: hand trimmer, which offered approximately 400 jobs in Tennessee and 13,000 nationally; assembler, 100 in

_____

[5]A resume detailing Ms. McBroom Weiss's background and experience is included in the administrative record at Tr. 101-104.

[6]Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. 20 C.F.R. §§ 404.1567(b) and 416.967(b).

[7]Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. 20 C.F.R. §§ 404.1567(a) and 416.967(a).

8

Tennessee and 38,000 nationally; and security surveillance monitor, 200 in Tennessee and 17,000 nationally (Id.).

## III. Conclusions of Law

### A. Standard of Review

This court reviews the final decision of the SSA to determine whether that agency's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied. Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d 124, 125 (6th Cir. 2003). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007)(quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)). Even if the evidence could also support a different conclusion, the SSA's decision must stand if substantial evidence supports the conclusion reached. Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389 (6th Cir. 1999).

### B. Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. at §

9

423(d)(3).  In proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

> 1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

> 2) A claimant who does not have a severe impairment will not be found to be disabled.

> 3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations.  Claimants with lesser impairments proceed to step four.

> 4) A claimant who can perform work that he has done in the past will not be found to be disabled.

> 5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)(citing, e.g., Combs v. Comm'r of Soc. Sec., 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b)-(f).

The SSA's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule.  See Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003).  Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination.  Id.; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990).  In such cases where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima*

*facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert ("VE") testimony. See <u>Wright</u>, 321 F.3d at 616 (<u>quoting</u> Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); <u>see</u> <u>also</u> <u>Varley v. Sec'y of Health & Human Servs.</u>, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); <u>Foster v. Bowen</u>, 853 F.2d 483, 490 (6th Cir. 1988).

### C. <u>Plaintiff's Statement of Errors</u>

Plaintiff first argues that the ALJ erred in failing to find her disabled pursuant to Listing 12.04, pertaining to affective disorders. Plaintiff claims that her bipolar disorder is of listing-level severity, as qualified under Listing 12.04(C). The pertinent criteria are as follows:

> 12.04 Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
>
>      . . .
>
> C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do

basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

. . .

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate[.][8]

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.

Plaintiff contends that her chronic bipolar disorder has left her so unstable that she would be prone to decompensate with even minimal change in her environment, as evidenced by her panic attacks, inability to work on a consistent basis or attend school in a crowded classroom, and past suicide attempt. However, upon review of the record evidence, plaintiff's mood disorder can hardly be said to have resulted in such dire instability as to satisfy the severity criteria of the listing. Most notably, plaintiff's adaptive functioning was at a level that allowed regular performance of household chores, caring for her children and assisting them with their homework (Tr. 391), and, for a time, balancing a daily schedule

---

[8]"Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode."

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(4).

that included full-time work and college classes. Indeed, the notes of plaintiff's treatment at MHC reveal that, after stress from marital problems led her to overdose on her prescription mood and sleep aid medications in June 2008 (Tr. 586), she found a job in September 2008 (Tr. 591); expressed a desire to return to school in October 2008, and reported that "her moodiness and depression is a lot better when she can do more"(Tr. 593); and, after losing her job due to a misunderstanding in November (Tr. 598), began medical assistant school in December 2008, when she reported doing well from the standpoint of her psychological symptoms (Tr. 601-03). In 2009, plaintiff continued to report doing well, and found a job where she worked everyday from 2:00 until 10:00 p.m., and went to school 3 days per week from 8:30 a.m. until 1:00 p.m. (Tr. 607) Although her schedule was overwhelming at times (Tr. 608), she reported feeling well despite being busy (Tr. 609). She subsequently lost her job, but excelled in her schoolwork, finishing her spring semester with a 4.0 grade point average and earning recognition on the Dean's List. (Tr. 626-28) At her last recorded visit with her MHC case manager, plaintiff reported doing well and spoke of beginning summer classes, her new boyfriend, and her desire to one day become a nurse. (Tr. 628)

Throughout the MHC records, plaintiff's treatment regimen was generally consistent, and she was reportedly content with the prescription medications she was taking, which did not cause any particular side effects. While her rating on the Global Assessment of Functioning (GAF) scale during the time of her treatment at MHC reflects a serious level of impairment, it is clear that GAF scores represent no more than a clinician's subjective rating of the patient's contemporaneous, overall level of impairment, which does not correlate with the severity criteria of the Listings, nor should it be interpreted as

13

undermining more particular opinions on the patient's condition and functional ability.  See
Kennedy v. Astrue, 247 Fed.Appx. 761, 766 (6th Cir. Sept. 7, 2007) (citing Kornecky, 167
Fed.Appx. 496, 511 (6th Cir. Feb. 9, 2006)); see also, e.g., Smith v. Astrue, 565 F.Supp.2d 918,
925 (M.D. Tenn. 2008); 65 Fed. Reg. 50746, 50765 (Aug. 21, 2000) ("The GAF scale . . . does
not have a direct correlation to the severity requirements found in our mental disorder
listings.").  In light of the medical evidence and the record as a whole, it simply cannot be
said that plaintiff's mood disorder "has resulted in such marginal adjustment that even a
minimal increase in mental demands or change in the environment would be predicted to
cause [her] to decompensate," as required to establish presumptive disability under Listing
12.04(C)(2).

       Moreover, notwithstanding plaintiff's argument to the contrary, no additional
expert testimony is required to establish this fact.  Under the SSA's regulations and rulings,
and consistent with Sixth Circuit caselaw,

> [T]he requirement that expert opinion evidence [on the issue of equivalence to
> a listed impairment] be received into the record is met as long as the record
> includes one of several listed documents signed by a state agency medical or
> psychological consultant.  The Ruling [(SSR 96-6p)] limits the circumstances
> when the ALJ must seek an *updated* medical opinion on the issue of
> equivalence as follows:

> > When no additional evidence is received, but in the opinion of the
> > [ALJ] the symptoms, signs, and laboratory findings reported in the case
> > record suggest that a judgment of equivalence may be reasonable; or

> > When additional medical evidence is received that in the opinion of
> > the [ALJ] may change the State agency medical or psychological
> > consultant's finding that the impairment(s) is not equivalent in severity
> > to any impairment in the Listing of Impairments.

14

Lyke v. Astrue, 2011 WL 2601429, at *6 (M.D. Tenn. June 30, 2011) (quoting SSR 96-6p, at *4). Here, as in Lyke, state agency consultants specifically opined that plaintiff did not satisfy the "C" criteria of Listing 12.04 (Tr. 407, 487), and the ALJ adopted the consistent opinion of a consultative examiner after giving full consideration to the subsequent evidence that was not available to any of these consultants. Clearly the ALJ was not of the opinion that a finding of equivalence to Listing 12.04 might be reasonable, or that the opinion of the psychological consultants on this issue may have changed in light of the medical evidence which postdated their opinions. Accordingly, the ALJ was not required to call a medical expert on the issue of equivalence to Listing 12.04.

Plaintiff next raises four interrelated arguments concerning the ALJ's weighing of the medical evidence: that the ALJ erred in his finding of a residual functional capacity for a limited range of light work, in failing to consider all the evidence before him, in rejecting the opinion of her treating physicians, and in improperly evaluating her level of mental impairment. Plaintiff primarily takes issue with the ALJ's failure to recognize her bipolar disorder as a medically determinable impairment, and with his findings that her rheumatoid arthritis (RA) and attention deficit disorder (ADD) were nonsevere impairments. In her brief, plaintiff cites numerous online sources to impress upon the Court the significance of these diagnoses generally, and argues that the ALJ's disregard for these diagnoses is particularly egregious because the diagnosing physician (Dr. Aziz) is a specialist. However, a mere diagnosis says nothing about the effects of the impairment. Higgs v. Bowen, 880 F.2d 860, 863 (6th Cir. 1988). Furthermore, Dr. Aziz's specialization in internal medicine does not deserve any particular recognition vis-à-vis his diagnoses of conditions

15

outside of his specialty, such as bipolar disorder, RA, and ADD.  See 20 C.F.R. §

404.1527(d)(5) ("We generally give more weight to the opinion of a specialist *about medical*

*issues related to his or her area of specialty. . . .*") (emphasis added).

Bipolar disorder was diagnosed at times in the medical evidence by differing

sources, typically as a repeat diagnosis based on plaintiff's report of having been originally

diagnosed with the disorder in 2006.  (E.g., Tr. 522, 588, 594, 636, 799, 813)  However, the

most prevalent symptoms/limitations of this mood disorder were considered by the ALJ as he

weighed the credible effects of plaintiff's depressive disorder (the record does not reflect any

particular manic episodes), which was found to be a severe impairment affecting plaintiff's

residual functional capacity.  Accordingly, the undersigned finds no reversible error in the

ALJ's failure to recognize bipolar disorder as a severe, medically determinable impairment.

With respect to plaintiff's alleged rheumatoid arthritis and attention deficit

disorder, these diagnoses were found to be either not well established in the medical record,

or not demonstrated to present significant, work-affective symptoms.  (Tr. 13-14)  Plaintiff's

citation to sources explaining the range of possible symptoms associated with these

impairments does not prove otherwise.  Rather, the ALJ's finding that the rheumatoid

arthritis diagnosis (if indeed that is what the "RA" stands for in Dr. Aziz's ubiquitous

assessment of "RA - 481 - 5/Iron Overload," rather than a reference to plaintiff's anemia)[9] is

---

[9]Plaintiff cites the entirety of Dr. Aziz's treatment records to support her assertion that she
was diagnosed with rheumatoid arthritis.  (Docket Entry No. 14-1 at 10-11)  However, the only
references to "RA" appear to the undersigned to describe plaintiff's refractory anemia.  Medical
records from 2004 reflect that plaintiff suffered from severe iron deficiency anemia which had failed
treatment with oral iron replacement medications, resulting in her placement on intravenous iron
replacement therapy.  (Tr. 364-66)  This therapy was noted in 2006 to have achieved good results,
though plaintiff's ferritin level "was found to be well above normal[.]"  (Tr. 362-63)

16

not a medically determinable -- or, alternatively, not a severe -- impairment is supported by the absence of any particular confirmation of its diagnosis, including any evidence of plaintiff's referral to a rheumatologist. As to the symptoms which plaintiff asserts generally accompany the diagnosis of rheumatoid arthritis -- joint pain and overall fatigue -- the ALJ duly considered such alleged symptoms and found them to be unsupported by the record, as discussed further below.

As to the claim that plaintiff's ADD should have been found to be a severe impairment, the ALJ appropriately found that the evidence fails to reflect any work-related limitations owing to such disorder, but instead demonstrated that plaintiff was very successful in school and otherwise did not display any deficit in her ability to sustain concentration and attention. (E.g., Tr. 388-92) Plaintiff's citation to sources documenting generally the symptoms of this disorder, without citation to evidence of record demonstrating her own symptoms and limitations, is entirely unpersuasive.

The ALJ's consideration of plaintiff's treating source opinions, and his subsequent determination of her residual functional capacity for a range of light work, is substantially supported. Although treating source opinions are presumptively entitled to great (if not controlling) weight, Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 242 (6th Cir. 2007), in this case plaintiff's treating physicians did not render an opinion of her abilities to perform work-related activities, nor did they opine that plaintiff was suffering from limitations expected to be (and remain) disabling. Plaintiff cites the June 5, 2009 Clinically Related Group (CRG) assessment of Laurie Morris, a case manager with MHC (Tr. 580-82, 625), as an opinion by a treating source that she is unable to work. (Docket Entry No. 14-1

17

at 12)  However, under the regulations, Ms. Morris is an "other source" whose opinions are

deserving of consideration and perhaps discussion in the ALJ's opinion, SSR 06-03p, 2006

WL 2329939, at *6, rather than a treating source whose opinions are deserving of special

deference.  20 C.F.R. § 404.1513(d).  The opinion at issue here is Ms. Morris's assessment that

plaintiff had moderate psychological symptoms, but displayed major impairment in her

global functional ability (i.e., her assessed GAF score was 40 on the assessment date of June 5,

2009).  The ALJ gave explicit consideration to this GAF assessment, as follows:

> The assessed moderate limitations and GAF scores do not correspond.
> Furthermore, they are not supported by MHC treatment notes, as outlined
> above.  For example, on June 5, 2009, the claimant reported making the Dean's
> List and having a 4.0 grade point average.  She also denied having any
> financial, legal, physical, or social support issues.  However, that same day, her
> GAF score was estimated at 40[,] . . . indicat[ing] some impairment in reality
> testing or communication or major impairment in several areas, such as work
> or school, family relations, judgment, thinking or mood.

(Tr. 20; see Tr. 627-28)  In light of the cited inconsistency, the ALJ's decision to give Ms.

Morris's assessment minimal weight is substantially supported.  Likewise, the similar reports

of other sources providing mental health care through Volunteer Behavioral Health Care

System, including Nurse Bechard, were given due consideration by the ALJ, but were

deemed to be outweighed by the prior assessment of consulative examiner Linda Blazina,

Ph.D. (Tr. 388-93), and the consistent assessments of the nonexamining state agency

consultants (Tr. 396-409, 476-89).  The undersigned finds no error in the ALJ's

determination of plaintiff's mental limitations.

Plaintiff further claims error in the rejection of his treating physicians'

opinions, specifically those of Drs. Ahsan and Dr. Bacon.  Dr. Ahsan, a neurologist who

treated plaintiff in 2004-05, is alleged to have "noted that the claimant had tremors of both hands, which were made worse with anxiety and interfered with functioning." (Docket Entry No. 14-1 at 18) However, plaintiff's citation to the record in support of this statement consists of a treatment note revealing that Dr. Ahsan merely repeated plaintiff's subjective report of these symptoms and limitations, and an EEG study which yielded normal results. (Tr. 336, 342) Moreover, Dr. Ahsan reported that an EMG study on all four extremities yielded normal results. (Tr. 338-41) All of these observations and test results were produced in November 2004, and there was never any medical opinion associated with same for the ALJ to consider. Plaintiff is grasping at straws with this argument.

As to Dr. Bacon, the orthopaedic surgeon similarly repeated plaintiff's subjective complaint of lower back pain that radiates down her right hip and leg that is "generally worse with prolonged standing and walking" and "is gradually worsening," attributed in an MRI report to a disc herniation at the T12-L1 level of plaintiff's spine. (Tr. 577) His March 9, 2006 letter to Dr. Aziz reflects, however, that his examination of plaintiff yielded results consistent with muscular pain rather than pain radiating from a spinal defect. Id. The ALJ reviewed Dr. Bacon's letter and the evidence of plaintiff's lumbar spinal condition as follows:

> [Plaintiff] testified that [she] had an MRI done at Hendersonville Hospital in the past; surgery had been proposed, but she was scared to go through with it. The record contains no objective medical evidence indicating that the claimant has a spinal condition that would warrant surgical intervention or that surgery was ever proposed. In fact, Dr. Bacon wrote a letter in March 2006 stating that an MRI interpretation showed a broad-based disc herniation at the T-12/L-1 level; however, he also stated that he had not seen the study, and Hendersonville Medical Center thoracic spine radiographs of March 30, 2009 were negative. Further, Dr. Bacon also stated that the claimant's back

19

pain was more muscula[r] in nature and that although she complained of leg pain, he had explained to the claimant that a herniated disc at the T-12/L-1 level would not cause radiation of her pain down her leg. Furthermore, although the claimant has alleged a history of severe back problems, subsequent treatment notes from Dr. Bacon reveal that the claimant did not return again until June 2008 (more than 2 years later), and even then, her treatment was sporadic and no more than routine. She did not undergo any additional diagnostic studies, nor did she undergo any injections. The record also contains lumbar spine radiographs of October 2005 [that] were completely normal.

(Tr. 18) The undersigned finds that this determination of the objective severity of plaintiff's spinal impairment by the ALJ is reasonable and supported by substantial evidence.

Likewise, plaintiff argues that the ALJ failed to consider her "moderate-to-severe renal vascular disease and her lumbar cervical electrodiagnostic report, which revealed impaired conduction of the Class III fibers." (Docket Entry No. 14-1 at 18) However, plaintiff points to no particular symptoms of her renal vascular disease which might potentially affect her ability to work, nor do any appear from the record save perhaps hypertension, which the ALJ properly found to be well controlled. (Tr. 14) Similarly, the ALJ appropriately considered plaintiff's complaints of cervical and lumbar pain and postural limitation; the failure to explicitly consider a one-page, nearly inscrutable report of moderately impaired nerve fiber conduction is of no moment, so long as substantial evidence on the record as a whole supports the ALJ's decision. Heston v. Comm'r of Soc. Sec., 245 F.3d 528, 535-36 (6th Cir. 2001).

In arriving at his finding of plaintiff's residual functional capacity, the ALJ relied heavily on the assessments of the consultative examiners, Drs. Gomez and Blazina. In the absence of any treating source assessments of work-related physical limitations, and

20

considering the rather benign findings on Dr. Gomez's physical examination (Tr. 15, 461-63), as well as plaintiff's own testimony that she could lift twenty pounds and her prior report of relatively robust daily activities involving chores and childcare, the ALJ's finding that plaintiff could engage in light work with occasional postural and environmental limitations is supported by substantial evidence on the record as a whole. The additional, mental limitations requiring that job instructions and matters requiring work-related judgments be kept simple, as well as that contact with the public not be required, are justified by the evidence produced during plaintiff's consultative psychological examination with Dr. Blazina, and even appear overly restrictive when compared with the reports of her mental health progress by her case managers and other providers at MHC, as discussed above. Accordingly, the undersigned finds no error in the ALJ's determination of plaintiff's residual functional capacity.

   Plaintiff next argues that the ALJ erred in failing to properly consider her obesity and its effects on her ability to work. However, the ALJ specifically mentioned the diagnosis of obesity by both Dr. Gomez and Dr. Aziz (Tr. 15-16), noted that Dr. Aziz had prescribed Ritalin to help with fatigue and weight loss (Tr. 13), found obesity to be a severe impairment (id.), and incorporated into his RFC finding the occasional postural limitations assessed by the nonexamining consultant, Dr. Robinson (Tr. 19-20), who opined that such limitations were due to plaintiff's combination of conditions (Tr. 470) and twice referenced her weight in the comments supporting his assessment. (Tr. 475) It is clear to the undersigned that the ALJ gave due consideration to plaintiff's obesity.

   Plaintiff generally argues that the ALJ erred in failing to find her subjective

complaints credible, since those complaints are consistent with the complaints of symptoms voiced to her doctors over the years. However, the ALJ's credibility determination is due considerable deference on judicial review, see, e.g., Jones v. Comm'r of Soc. Sec., 336 F.3d 469, 476 (6th Cir. 2003), and particularly so where the ALJ's reasoning is based on a variety of inconsistencies between plaintiff's testimony on the one hand, and on the other hand the objective medical evidence and plaintiff's reports of activities, lack of medication side effects, recreational drug use, etc. See Tr. 18-19. In short, for the reasons given in his opinion, it was entirely appropriate for the ALJ to call into question plaintiff's credibility as a witness, and substantial evidence supports his finding that her subjective complaints of pain and other limitation are only credible to the extent that they are consistent with the ALJ's finding of her RFC.

Lastly, plaintiff's arguments that the ALJ failed to correctly evaluate her mental conditions, and that he erred in relying on the vocational expert's testimony because he did not present the expert with a proper account of the limitations resulting from those conditions (Docket Entry No. 14-1 at 23-24), simply rehash the contentions already rejected herein. The decision of the ALJ is supported by substantial evidence, and is not contrary to law or the regulations. The undersigned thus concludes that the SSA's denial of benefits in this case should be affirmed.


## IV. Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record (Docket Entry No. 14) be DENIED, and

that the decision of the SSA be AFFIRMED.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 5th day of October, 2012.

s/ John S. Bryant
JOHN S. BRYANT
UNITED STATES MAGISTRATE JUDGE